**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jazmin Cortez Gonzalez,<br><br>    Petitioner,<br><br>v.<br><br>Israel Acosta Pena,<br><br>    Respondent. | No. CV-16-00352-PHX-DLR<br><br>**ORDER** |

  Petitioner Jazmin Gonzalez has filed an Amended Petition for Return of Child under the Hague Convention. (Doc. 7.) Respondent Israel Pena opposes the petition. The Court held an evidentiary hearing on July 5, 2016. Based on the following findings of fact and conclusions of law, the Court denies the petition.

**I. Background**

  On February 8, 2016, Gonzalez filed a petition for return of her two minor children, J.P. and A.P., to Mexico pursuant to the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001 *et seq.*, which implements the provisions of the Hague Convention on the Civil Aspects of International Child Abduction, 19 I.L.M. 1501 (1980). Gonzalez alleges Pena, J.P. and A.P.'s father, has refused to return the Children to Mexico. Pena and the Children currently reside in Scottsdale, Arizona.

**II. Findings of Fact**

  Gonzalez is a Mexican citizen residing in Santiago Ixcuintla, La Presa, Nayarit,

1 Mexico. Pena is a Mexican citizen residing in Scottsdale, Arizona. The parties are the
2 parents of two Children: J.P., born in 2007, and A.P., born in 2005. The parties were
3 never married, but resided together in Scottsdale prior to and after the births of the
4 Children. Both Children were born in Scottsdale and are dual citizens of Mexico and the
5 United States.

6 Gonzalez, Pena, and the Children resided in Scottsdale until approximately four
7 years ago when Gonzalez decided to move to Nayarit, Mexico with the Children. Pena
8 continued to reside in Scottsdale and visited the Children in Mexico under the
9 supervision of Gonzalez for approximately 21 days per year. There are no court orders
10 dictating the parties' parenting time.

11 On June 7, 2015, Gonzalez agreed that the Children could visit Pena in Scottsdale
12 unsupervised during a break from school. Gonzalez also intended that, while in Arizona,
13 the Children could renew their United States Passports. The parties agreed that Pena
14 would return the Children to Mexico by August 6, 2015 so that they would be home in
15 time to for the start of school.

16 Approximately one week before the Children were to be returned to Mexico, A.P.
17 informed Pena that she had been sexually abused by Gonzalez's live-in boyfriend. As a
18 result, Pena decided to not allow the Children to return to Mexico. On August 8, 2015,
19 Gonzalez's mother traveled to Scottsdale to locate the Children and bring them back to
20 Mexico. Pena, however, refused to allow her to speak with the Children alone and
21 refused to allow the Children to return.

22 At the hearing, Gonzalez testified regarding the allegations of abuse as follows:

23
24
25
26
27
28
My daughter [A.P.], she's the ten-year-old, one day when she was angry
because she was being punished she told me that my current boyfriend was
touching her. Only touching. Not sexually abusing. Of course I spoke to
my boyfriend. He denied everything. And it was impossible because my
teenage daughter sleeps in the same room with my other daughters. And I
am always paying attention to them. But anyway, I did believe what she
told me in that moment and I kicked my boyfriend out of the house. I told
him to leave and never come back. Two weeks passed and my daughter
[A.P.] came to me crying one day and she said that she regretted what she

> had done, that she had lied, that she said it in a moment when she was angry. Because she wanted me to go back to her dad and for her dad and I to live together again.

Gonzalez testified that she did not report the incident to the police because it was impossible for such abuse to occur. She did not believe it could happen because she always closely watches her daughters. She did, however, kick her boyfriend out to show "[A.P.] that I was there for her [and] to show her that I was listening to her and to give the situation time to clarify[.]" Gonzalez further stated that A.P. told her that the abuse occurred in the bedroom she shares with her sisters, which Gonzalez deemed impossible because she is the only person with the bedroom door key.

In March 2016, Pena contacted case worker Rozalind Wirth of the Arizona Department of Child Services who investigated the allegations of abuse. At the hearing, Wirth also testified regarding the abuse. She stated that A.P. told her that Gonzalez's boyfriend, Jorge, had "touched her inappropriately on her bottom, the front and the back." A.P. stated that it occurred once in her bedroom in Mexico, though Wirth admitted she did not ask how many instances of abuse had occurred. She stated that she has not yet fully completed her investigation because she was unable to contact Gonzalez or her boyfriend in Mexico.

Dr. Ester Ruiz, a psychologist and psychiatric nurse practitioner, also testified regarding the abuse. Ruiz first saw both A.P. and J.P. in May 2016 and diagnosed A.P. with post-traumatic stress disorder. She stated that, due to the abuse, A.P. was having disruption in her sleep, anxiety, depressive symptoms, nightmares, and difficulty coping with her thoughts and feelings about the abuse. Ruiz testified that both A.P. and J.P. have told her that they do not want to return to Mexico, though J.P. has denied being sexually abused. Ruiz stated that it would be harmful to J.P. if she were to be separated from her sister.

Ruiz further testified that A.P. told her the abuse occurred several times over a three year period. Ruiz understood that it occurred when A.P. was left home alone during the day to take care of a two-year old child, as well as when Gonzalez was asleep in

another room. She said that A.P. told her that Gonzalez's boyfriend rubbed "her chest, her genitals, her buttocks and her thighs and push[ed] her against his erection and tr[ied] to force her to touch his penis[.]" Ruiz stated that A.P. told her that this occurred when she was alone with Gonzalez's boyfriend in the bedroom.

Pena testified last. He stated that he first learned of the abuse in late July 2015. He stated that both girls were acting differently, would not eat, and did not want to go back to Mexico. A.P. disclosed the incident while they were driving, and Pena pulled off the freeway in shock. Pena stated that he called the Scottsdale Police Department, but could not file a report because the incident took place in Mexico. Eventually, he communicated to Gonzalez that he wanted to keep the Children in Scottsdale, but did not mention anything about the abuse. A few months later, after having difficulty finding a Spanish-speaking psychologist, he contacted Ruiz about therapy.

From this testimony, the Court concludes that A.P. suffered sexual abuse in Mexico at the hands of Gonzalez's boyfriend at least once. Though Gonzalez claims A.P. recanted her story, A.P. later confirmed the abuse to Pena, as well as to Wirth and Ruiz. The allegations are consistent, and Wirth and Ruiz have stated that A.P., as well as her sister J.P., have suffered emotionally from the incident. In addition, Gonzalez's testimony regarding A.P.'s recantation is not credible. Gonzalez provides no explanation as to why A.P. would state that she was abused to three individuals after recanting her allegations to Gonzalez. And her claim that no abuse could have occurred because she had the only key to the bedroom is illogical. If true, this suggests that Gonzalez locked the Children in their room every night, making them unable to get up to use the bathroom or to escape during a fire. Moreover, Gonzalez's testimony that she locked the children in the bedroom just as plausibly suggests that she recognized a need to protect the Children from her boyfriend.

**III. Conclusions of Law**

"The Hague Convention on the Civil Aspects of International Child Abduction seeks to deter parents from moving their children across international borders in order to

gain the upper hand in custody disputes." *Aguilera v. De Lara*, No. CV14-1209 PHX DGC, 2014 WL 3427548, at *1 (D. Ariz. July 15, 2014) (citing *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010)). "A court that receives a petition under the Hague Convention may not resolve the question of who, as between the parents, is best suited to have custody of the child." *Cuellar*, 596 F.3d at 508. Instead, the court's role is limited to determining whether, by a preponderance of the evidence, removal or retention of the child is wrongful under the Convention, and if so, order return of the minor child to the country of habitual residence. Convention, Art. 12. A removal is wrongful if

> (a) it is in breach of rights of custody attributed to a person . . . under the law of the state in which the child was habitually resident immediately before removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, Art. 3.

Notwithstanding a finding that the removal or retention was wrongful, the court need not order return if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, Art. 13(b). This exception is to be narrowly construed, and "is not a license for a court in the abducted-to country to speculate on where the child would be happiest." *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005). The burden lies with the respondent to demonstrate by clear and convincing evidence that the exception applies. 22 U.S.C. § 9003(e)(2)(A).

**A. Wrongful Removal**

To determine whether removal is wrongful, the following questions are relevant:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

- 5 -

*Jaksic v. Serif*, No. CV-14-01937-PHX-NVW, 2014 WL 6685375, at *5 (D. Ariz. Nov. 26, 2014) (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001)).

The parties agree that the retention took place on August 6, 2015, when Pena refused to return the Children to Mexico. In addition, the Court finds that Mexico was the "habitual residence" of the Children when the action was filed. "In answering the question of habitual residency, a court should consider whether the child has been physically present [in the country] for an amount of time sufficient for acclimatization and whether the place has a degree of settled purpose from the child's perspective." *Simcox v. Simcox*, 511 F.3d 594, 602 (6th Cir. 2007) (internal quotation marks omitted) (alterations in original). Here, it is undisputed that the Children lived with Gonzalez in Mexico for nearly four years prior to the retention. There, they attended school and Gonzalez cared for their basic needs. Four years is sufficient time to acclimate to Mexico, and the Court finds the Children were settled there for purposes of establishing habitual residency.[1]

The Court also finds that Gonzalez had custodial rights to the Children under the Mexican law doctrine of patria potestas, *see, e.g.*, *Whallon v. Lynn*, 230 F.3d 450, 459 (1st Cir. 2000) (finding the doctrine sufficient to establish custodial rights under the Convention); *Aguilera*, 2014 WL 3427548, at *2 (noting that the doctrine affords both parents the right to care for, reside with, and otherwise provide for the necessities of their children), that she was exercising those rights at the time of the retention, and that Pena's retention of the Children violated those rights. It is undisputed that Gonzalez did not consent to the Children remaining in the United States. Gonzalez permitted the Children to remain with Pena during school break, but she instructed him to return them to Mexico in time for the beginning of school. Gonzalez demanded the Children back and even sent her mother to Pena's residence. Accordingly, having answered all questions in the affirmative, the Court finds Gonzalez has established by a preponderance of the evidence

---

[1] Pena argues the Children were wrongfully removed from Arizona in 2012, but fails to provide any evidence in support of this contention.

- 6 -

that Pena's retention is wrongful under the Convention.[2]

**B. Grave Risk Exception**

Although Pena's retention is wrongful, the Court finds he has met his burden of presenting clear and convincing evidence that returning the Children to Mexico presents a "grave risk" or would be an "intolerable situation." "Sexual abuse most certainly constitutes a 'grave risk' of physical or psychological harm." *Ortiz v. Martinez*, 789 F.3d 722, 728 (7th Cir. 2015). As explained above, the Court concludes that the evidence clearly and convincingly establishes that Gonzalez's live in boyfriend sexually abused A.P. at least once. Moreover, Gonzalez's reaction to the incident is somewhat troubling. Gonzalez stated that she did not believe any abuse could have occurred because she had the only key to the bedroom. But A.P. reported to Ruiz that at least one instance of abuse occurred while she was babysitting another child at the home. At one point, Gonzalez stated that she believed only "touching" had occurred, "not sexual abuse." And she stated that she kicked her boyfriend out of the house not because she believed any abuse had occurred, but because she wanted the "situation to clarify." Notably, not once during her testimony did Gonzalez state that she would take any steps to protect the Children from abuse if they returned to Mexico.[3]

The evidence also demonstrates that the Children have already suffered psychologically from the abuse. A.P. has been diagnosed with post-traumatic stress disorder, and J.P. has been experiencing anger issues with the incident. A.P. has experienced some depression, and experiences trouble sleeping and nightmares. Though J.P. has denied being abused, and while general "adjustment problems that would attend the relocation of most children" does not meet the grave risk exception, the Court finds

---

[2] The Court is unable to determine whether the Children are mature enough for their objections to returning to Mexico to be considered. The Children did not testify at the hearing, and the parties presented no evidence of each child's level of maturity.

[3] Some courts, even in the face of grave risk or an intolerable situation, return the child to his habitual residence if certain "undertakings" are guaranteed by the parent. *See Simcox*, 511 F.3d at 605-06 (citing *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995)). Here, Gonzalez offered no such guarantees.

separating the Children would significantly aggravate their emotional state. *C.f. Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996) (finding adjustment problems with relocation in case with no alleged abuse did not meet grave risk exception). Consequently, the Court is convinced that sending the Children back to Mexico to live with Gonzalez would pose a grave risk to their physical and psychological well-being or constitute an intolerable situation for them.

### C. Conclusion

In sum, the Court finds that Pena wrongfully retained the Children in Scottsdale, Arizona. Given the clear and convincing evidence of sexual abuse, however, the Court finds that returning the Children to Mexico would pose a grave risk to their physical and psychological well-being. To be clear, the Court is not deciding who is the better parent, nor is it concluding that Pena is entitled to custody of the Children. Those issues may be resolved in the appropriate forum at a later date. In its discretion, the Court is deciding only that, in light of the evidence presented, the Children should not be ordered to return to Mexico.

### IV. Attorneys' Fees and Costs

Both parties requested attorneys' fees and costs in their respective pleadings. But ICARA "does not authorize a court to order a petitioner to pay a respondent's fees and costs if the court does not order return of the child." *Jaksic*, 2014 WL 6685375, at *6; 22 U.S.C. § 9007(b). Accordingly, because the Court is not ordering return of the Children to Mexico, the parties will bear their own fees and costs incurred in this matter.

//
//
//
//
//
//
//

**IT IS ORDERED** that Gonzalez's Amended Petition for Return of Child, (Doc. 7), is **DENIED**. The Clerk shall terminate this case.

Dated this 7th day of July, 2016.

_____
Douglas L. Rayes
United States District Judge